**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**CEDRICK PELLERIN ET AL**                    **CASE NO.  6:20-CV-01380**

**VERSUS**                                    **JUDGE ROBERT R. SUMMERHAYS**

**LAFAYETTE CONSOLIDATED**                    **MAGISTRATE JUDGE CAROL B.**
**GOVERNMENT ET AL**                          **WHITEHURST**

**MEMORANDUM RULING**

The present matter before the Court is a Motion for Summary Judgment filed by

defendants Scott Morgan—the former Chief of Police of Lafayette, Louisiana—and the

Lafayette City-Parish Consolidated Government ("LCG") [ECF No. 35]. Plaintiffs Cedrick

Pellerin and Michelle Pellerin, individually and on behalf of their deceased son, Trayford

Pellerin, filed an Opposition to the Motion for Summary Judgment [ECF No. 44]. After

considering the summary judgment record, the parties' pleadings and briefs, and the relevant

authorities, the Court rules as follows.

**I.**
**BACKGROUND**

The present case arises from a widely publicized encounter between officers from the

Lafayette Police Department (LPD) and Trayford Pellerin on August 21, 2020, that ended with

Pellerin's shooting. The summary judgment record reflects that four calls were placed to 911 and

LPD on August 21st concerning a Black male—subsequently identified as Trayford Pellerin—

allegedly harassing customers at a Circle K convenience store located on Northeast Evangeline

Thruway, Lafayette, Louisiana.[1] The first three calls were made by employees at the Circle K,

---

[1] ECF No. 35-3, Exhibit A to Defendants' Motion for Summary Judgment, Attachment 1 (911 call folders and LPD call folder).

who reported that Pellerin was shouting incoherently and scaring customers.[2] During one of the calls, the caller indicated that Pellerin was carrying a knife.[3] In another call, a witness outside the Circle K informed the dispatcher that Pellerin was carrying a knife and that he later placed the knife in a pouch around his waist.[4] The caller also expressed concern about the safety of the Circle K employees.[5] Police were dispatched and arrived on the scene during that fourth call.[6] One of the first officers to arrive, Officer Gerald Moss, observed Pellerin crossing Evangeline Thruway and pursued Pellerin on foot.[7] Body camera footage from another responding officer, Officer Pablo Estrada, showed him engaging with Pellerin and ordering Pellerin to "get over here."[8]  Pellerin raised his hands in the air, exclaimed "oh, no," and started backing into traffic on Evangeline Thruway.[9] Pellerin then turned around and began walking quickly away from officer Estrada.[10] Pellerin armed himself with the knife and Estrada pursued Pellerin on foot while shouting commands at Pellerin to stop and "get on the ground."[11]  Body camera footage shows Pellerin challenging Officer Estrada to "taze me" and raising the knife above his waist with the blade of the knife pointing towards Estrada.[12] Officer Estrada attempted to fire his Taser at Pellerin but the shot was ineffective—the Taser darts did not appear to make full contact with Pellerin's body.[13] Pellerin then waived his knife and shouted "I'm going to stab you."[14]

---

[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Louisiana State Police Investigation File, Supplement 6 Cpl. Jarrell Moss Interview).
[8] *Id.* (Louisiana State Police Investigation File, Supplement 6 Cpl. Jarrell Moss Interview; Supplement 7 Ofc. Pablo Estrada Interview).
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

Pellerin weaved in and out of traffic on Evangeline Thruway and walked onto the property of a second Circle K convenience store on Evangeline Thruway.[15] A police cruiser was deployed to try to cut Pellerin off from entering the second convenience store.[16] Pellerin continued to ignore commands to stop and to get on the ground. Responding officers attempted to fire another Taser to stop Pellerin, but the second Taser shot failed.[17] Pellerin then attempted to enter the second Circle K store.[18] The officers saw that there were customers in that store.[19] The responding officers shouted to Pellerin "do not enter the store" and "do not go in that store."[20] When Pellerin, who was armed with the knife, reached for the door of the store, three of the responding officers discharged their duty weapons, striking Pellerin.[21] Pellerin later died from his wounds.

Cedrick and Michelle Pellerin (Trayford's parents) filed the present action on October 26, 2020, asserting claims under 28 U.S.C. §1983 and state law claims against former LPD Chief Scott Morgan, LPD, LCG, ten unidentified "John Doe" LPD officers, and two unidentified insurance companies. The Court dismissed claims against LPD on the ground that LPD was not a distinct juridical entity with the capacity to be sued.[22] Morgan and LCG filed an answer.[23] No answers were filed for the "John Doe" officer defendants or the fictitious insurance company defendants.

---

[15] *Id.*
[16] *Id.*; ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 8 Sgt. Robinson Olivero Interview).
[17] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 14 Sr. Cpl. Tyler Howerton Interview).
[18] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 14 Sr. Cpl. Tyler Howerton Interview; Supplement 15 Ofc. Malik Savoy Interview; Supplement 13 K-9 Ofc. Kevin McFarlain Interview).
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] ECF No. 21.
[23] ECF No. 13.

3

The case was subsequently stayed from December 2020 to August 2021 to allow the Louisiana State Police to complete their investigation of Pellerin's shooting.[24] The Court then entered a scheduling order that set a discovery deadline of July 25, 2022, and a June 23, 2022, deadline to amend pleadings and join parties.[25] Plaintiffs did not seek leave to amend their complaint prior to the June 2022 deadline, nor did they seek leave to substitute the ten unidentified "Doe" defendants listed in the complaint with the names of the LPD officers they intend to sue. Defendants subsequently filed the present Motion for Summary Judgment.

## II.
### SUMMARY JUDGMENT STANDARD.

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[26]  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[27] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[28]

The opposing party may not create a genuine dispute simply by alleging that a dispute exists. Rather, the opponent must cite "to particular parts of materials in the record," or show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

---

[24] ECF Nos. 7, 10.
[25] ECF No. 22.
[26] FED. R. CIV. P. 56(a).
[27] *Quality Infusion Care, Inc. v. Health Care Service Corp*., 628 F.3d 725, 728 (5th Cir. 2010).
[28] *Lindsey v. Sears Roebuck and Co*., 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

party cannot produce admissible evidence to support the fact."[29] When reviewing a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[30] Credibility determinations, assessments of the probative value of the evidence, inferences drawn from the facts and the like are not to be considered on summary judgment, as those are matters to be decided by the factfinder at trial.[31]

### III.
### DISCUSSION

#### A.  The "John Doe" Officer Defendants.

Defendants contend that the claims asserted against the "John Doe" officer defendants should be dismissed because, despite the opportunity for discovery, Plaintiffs have never amended their complaint to correctly identify the LPD officers they are naming as defendants. Citing several district court decisions, Defendants argue that "fictitious party" practice is impermissible under the Federal Rules of Civil Procedure. There does not appear to be any *per se* rule against commencing an action in federal court with unidentified Doe defendants if a plaintiff cannot ascertain the names of the actual defendants prior to filing suit but, with the aid of discovery, can later amend the complaint to name the actual defendants they intend to sue.[32] Courts generally dismiss claims against "Doe" defendants when plaintiffs cannot, or do not,

---

[29] FED. R. CIV. P. 56(c)(1); *see also id.* at (c)(3) (the court need only consider the cited materials, although it is permitted to consider other materials in the record as well).
[30] *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 373 (5th Cir. 2001).
[31] *See e.g. Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 478 (5th Cir. 2006); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).
[32] *Stumpf v City of Waxahachie*, No. 04-CV-946, 2004 WL 2413306, at *2 (N.D. Tex. Oct. 26, 2004); 5A Wright, Miller & Spencer, Federal Practice and Procedure (Civil) § 1321 (4th ed. 2018).

amend the complaint to name the proper defendants and timely serve those defendants.[33] In the present case, the deadline to join parties and amend the pleadings had lapsed at the time Defendants filed their motion for summary judgment. The names of the LPD officers involved in Pellerin's shooting are reflected in the reports and records of both the Louisiana State police and LPD, all of which was discoverable.[34] Nevertheless, Plaintiffs did not request leave to amend their pleadings to substitute the names of the proper LPD officer defendants. Nor did Plaintiffs seek relief from the deadline to amend and join parties.

Even if Plaintiffs had sought leave to amend and substitute the names of the proper defendants, these claims would be subject to the applicable statute of limitations. Section 1983 contains no independent limitations period. As a result, the "settled practice is to borrow an 'appropriate' statute of limitations" from the forum state.[35] The Fifth Circuit has held that Louisiana's one-year prescriptive period for personal injury actions under La. Civ. Code Ann. art 3492 governs the limitations period for Section 1983 claims filed in Louisiana.[36] Plaintiffs' Section 1983 claims are based on Pellerin's encounter with LPD officers on August 21, 2020. The statute of limitations thus lapsed in August 2021without any effort by Plaintiffs to name and properly serve the LPD officers they seek to name as defendants. Even if Plaintiffs had sought an amendment after the limitations period expired, the amendment would not relate back under Rule 15(c) of the Federal Rules of Civil Procedure. In *Stumpf*, the court dismissed claims against unnamed "Doe" officer defendants who were not properly named and served within the

---

[33] *Stumpf*, 2004 WL 2413306, at *2; 5A Wright, Miller & Spencer, Federal Practice and Procedure (Civil) § 1321 (4th ed. 2018) ("When a plaintiff is ignorant as to the true identity of a defendant at the time of filing the complaint, most federal courts typically will allow the use of fictitious names in the caption so long as it appears that the plaintiff will be able to obtain that information through the discovery process; should that not prove to be true, the action will be dismissed.").
[34] ECF No. 35-3.
[35] *King-White v. Humble Indep. Sch. Dist*., 803 F.3d 754, 758 (5th Cir. 2015) (citation omitted).
[36] *See Lavellee v. Listi*, 611 F.2d 1129 (5th Cir.1980)

applicable statute of limitations.[37] The court observed that an amendment correcting the name of

a party mistakenly identified with the incorrect name in an earlier pleading normally relates back

to the time of filing for purposes of the statute of limitations under Rule 15(c). An amendment

does not, however, relate back under Rule 15(c) where a plaintiff originally "uses a pseudonym

due to lack of information."[38] Accordingly, Court grants Defendants' Motion for Summary

Judgment and dismisses Plaintiffs' Section 1983 claims against the "Doe" officer defendants.

### B.  Former Chief Morgan.

Defendants next challenge Pellerin's claims against Chief Morgan in his personal and

official capacities. "Section 1983 provides a remedy against 'any person' who, under color of

state law, deprives another of rights protected by the Constitution."[39] Section 1983 "is not itself a

source of substantive rights; it merely provides a method for vindicating federal rights conferred

elsewhere."[40] To state a claim under Section 1983, a plaintiff must: (1) allege a violation of

rights secured by the Constitution or laws of the United States, and (2) demonstrate that the

alleged violation was committed by a person acting under color of state law.[41] "A judgment in a

§ 1983 lawsuit against an official in his official capacity imposes liability against the entity he

---

[37] 2004 WL 2413306, at *2.

[38] *Stumpf*, 2004 WL 2413306, at *2 (citing *Jacobson v. Osborn*, 133 F.3d 315, 321 (5th Cir. 1998)). The Court notes that the analysis of Plaintiffs' claims against the fictitious "John Doe" officers applies equally to the claims against the fictitious "ABC" and "XYZ" insurance companies.  The Complaint was not amended to substitute the insurers' true names before either the deadline to amend pleadings or the limitations period passed; they have not been served; and they are not represented.  Furthermore, the Complaint asserts no claims against or misconduct by the insurers themselves, but only names them as providers of liability and excess liability coverages.  In other words, they are only named to ensure that Plaintiffs can recover damages arising from the misconduct of the other named defendants.

[39] *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120 (1992) (citing 42 U.S.C. § 1983).

[40] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

[41] *Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008).

represents."[42] Therefore, it is "well settled that a suit against a municipal official in his or her official capacity is simply another way of alleging municipal liability."[43]

Defendants argue that the official capacity claims against Morgan are duplicative of Section 1983 claims asserted against LCG. The Complaint expressly asserts Section 1983 claims against Morgan in his official capacity as the former Lafayette Chief of Police.[44] The claims and remedies sought against Morgan and LCG in this case are the same and, in fact, the Complaint repeatedly pleads claims against Morgan and LCG collectively.[45] Since Morgan was an official of LCG at the time of Pellerin's shooting and LCG is a defendant in this action, the claims asserted against Morgan are duplicative of the claims asserted against LCG. The Court therefore grants the Defendants' Motion for Summary Judgment with respect to the claims asserted against Morgan in his official capacity. These claims are dismissed.

Defendants also challenge the claims asserted against Morgan in his individual capacity. Section 1983 does not "create supervisory or *respondeat superior* liability."[46] Supervisory officials may be held liable for a Section 1983 violation only if they either were personally involved in the constitutional deprivation or if there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."[47] To prove that a supervisory official is liable under Section 1983 in his individual capacity, a plaintiff must prove that the official (1) affirmatively participated in the acts causing the constitutional deprivation, or (2)

---

[42] *Deshotels v. Village of Pine Prairie*, No. 11-CV-2052, 2012 WL 1712358, at *4 (W.D. La. Apr. 13, 2012)
[43] *Howell v. Town of Ball*, No. 12–951, 2012 WL 3962387, at *4 (W.D. La. Sept. 4, 2012) (citing *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *Hafer v. Melo*, 502 U.S. 21 (1991); *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005).
[44] Complaint [ECF No. 10] at ¶ 1a ("[Morgan] was at all times Chief of Police at the Lafayette Police Department…[h]e is sued in his official capacity").
[45] ECF No. 3 at ¶¶ 48-52.
[46] *Oliver v. Scott,* 276 F.3d 736, 742 & n. 6 (5th Cir.2002); *see also Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987) (citations omitted) ("Under § 1983, supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability.").
[47] *Thompkins,* 828 F.2d at 304.

implemented unconstitutional policies that causally led to the plaintiff's injury.[48] A plaintiff asserting a claim for supervisory liability "must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant."[49]

Plaintiffs do not clearly delineate the allegations supporting the claims against Morgan in his individual capacity as opposed to his official capacity. Plaintiffs allege that Morgan was "the responsible decisionmaker and policymaker for the LPD," and that he was "responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrests and preserving peace in the City of Lafayette." However, almost all of the 31 references to Morgan in the body of the Complaint appear to allege claims against Morgan in his official capacity by grouping Morgan together with LCG and LPD and alleging that they collectively failed to adequately train and discipline LPD officers, and that they collectively failed to adopt and implement appropriate use-of-force and de-escalation policies.[50] However, Plaintiffs' allegations do not show that Morgan was present at any time during the events leading up to the shooting, nor does Plaintiffs' Opposition to the Motion for Summary Judgment point to any evidence showing that Morgan affirmatively participated in the acts causing the alleged constitutional deprivation. Indeed, Plaintiffs' Opposition does not even mention Morgan.

To the extent that Plaintiffs are alleging claims against Morgan in his individual capacity based on a "failure to train" or a "failure to supervise" theory, they must prove that Morgan (1) "either failed to supervise or train the subordinate official;" (2) "a causal link exists between the failure to train or supervise and the violation of the [Plaintiffs'] rights;" and (3) "the failure to

---

[48] *Hauenstein v. Hilton*, 716 F. App'x 359, 360 (5th Cir. 2018).
[49] *Jolly v. Klein,* 923 F. Supp. 931, 943 (S.D. Tex. 1996) (citing *Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir.1992)).
[50] ECF No. 3 at ¶¶ 48-52.

train or supervise amounts to deliberate indifference."[51] "Deliberate indifference is more than mere negligence."[52] To prove deliberate indifference, a plaintiff must establish that a supervisory official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the official must "also draw the inference."[53] A plaintiff alleging inadequate training must also "allege with specificity how a particular training program is defective."[54] A plaintiff must show that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[55]

In their motion for summary judgment, Defendants point to evidence from personnel files showing that the LPD officers involved in Pellerin's shooting received mandatory training, including "POST [Police Officers' Standards and Training] firearms qualifications," "Taser training," "duty and off-duty/secondary weapon qualification, patrol pistol, police rifle, ethics, police procedures," and "ongoing in-service training as required by POST and by the LPD."[56] Defendants also point to evidence that LPD had adopted written policies "stressing the value of human life, the exercise of restraint, and the use of deadly force only in limited situations."[57] Defendants also submitted an expert report opining that the responding officers in this case complied with generally accepted policies, practices, and training in escalating the force used against Pellerin, which Plaintiffs did not dispute.[58] In contrast neither the complaint nor

---

[51] *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).
[52] *Conner,* 209 F.3d at 796 (citation omitted).
[53] *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998).
[54] *Id.* at 345.
[55] *City of Canton,* 489 U.S. at 390.
[56] ECF No. 35-6 at 25.
[57] *Id.*
[58] *Id.*; ECF No. 35-6, Exhibit E to Defendants' Motion for Summary Judgment, Report of Emanual Kapelsohn.

Plaintiffs' Opposition to the Motion for Summary Judgment point to evidence of a pattern of specific training or supervisory failures in connection with Pellerin's shooting that can be attributed to Morgan, nor have they pointed to evidence showing that Morgan acted with deliberate indifference.[59] Instead, Plaintiffs' Opposition focusses almost entirely on the events leading up to Pellerin's shooting. According to the Fifth Circuit, "'[t]o succeed on his claim of failure to train or supervise' the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to 'demonstrate a *pattern of violations*.'"[60] Because Plaintiffs have not shown any genuine issues of material fact as to Morgan's liability in his individual capacity, the Court grants Defendants' Motion for Summary Judgment with respect to the individual-capacity claims asserted against Morgan.

### C. *Monell* Liability.

Defendants next challenge Plaintiffs' *Monell* claims. As with Morgan, LCG may not be held liable under Section 1983 on a theory of vicarious liability.[61] However, a municipality may be independently liable under *Monell v. Dep't of Soc. Servs.*, for unconstitutional conduct that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[62] In other words, the unconstitutional conduct at issue must be directly attributable to the municipality through some sort of official action. A Section 1983 *Monell* claim requires proof that (1) an official policy, (2) promulgated by the municipal policymaker, (3) was the moving force for the violation of a constitutional right.[63] Official policies may exist in the form of "written policy statements, ordinances, or regulations, but may

---

[59] *Smith,* 158 F.3d at 912.
[60] *Est. of Davis ex rel. McCully*, 406 F.3d at 383 (quoting *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003)) (emphasis in original).
[61] *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017), *cert. denied sub nom. Hicks-Fields v. Harris Cty., Tex.*, ____ U.S. ____, 138 S. Ct. 510 (2017).
[62] 436 U.S. 658, 690 (1978).
[63] *Blanchard-Daigle v. Geers,* No. 18-51022, 2020 WL 730586, at *2 (5th Cir. Feb. 12, 2020).

also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."[64] To prove a *Monell* claim on the basis of a wide-spread practice, a plaintiff must establish, with evidence, "sufficiently numerous prior incidents," as opposed to "isolated instances."[65] A plaintiff "must do more than describe the incident that gave rise to his injury."[66] Rather, he must show incidents similar to the conduct at issue in the instant case—that is, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."[67]

Plaintiffs base their *Monell* claims against LCG on "a clear pattern of excessive and improper use of force, including lethal force, against African-Americans like Mr. Pellerin."[68] Plaintiffs allege that "between 2010 and 2019, there were 107 civil lawsuits filed against LPD."[69] Plaintiffs then briefly describe seven of these lawsuits as involving allegations of excessive force from 2007 through 2020—less than one case per year.[70] Neither the Complaint nor the summary judgment record reveal the facts or circumstances of the other civil complaints. Plaintiffs further allege that from 2010 through 2019, LPD officers submitted "1,172 use of force reports…equating to one approximately every 3 days."[71] Plaintiffs' Opposition to the Motion for Summary Judgement does not point to any evidence supporting their pattern allegations, nor

---

[64] *Id.*
[65] *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir.1989).
[66] *Ratliff v. Aransas Cty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020).
[67] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).
[68] ECF No. 3 at ¶ 59.
[69] *Id.* at ¶ 54.
[70] *Id.* at ¶ 55. Plaintiffs also state that "[a]t least ten more lawsuits have been filed in federal court alone detailing excessive use of force, improper training, improper hiring, and improper discipline against LPD," but do not describe these cases. *Id.* Plaintiffs further allege that, in 2012, "LPD was sued for their lack of supervision and proper discretion in hiring and training officers, for their misconduct, in handling of evidence." *Id.* Plaintiffs, however, fail to show whether the allegations of this 2012 lawsuit are similar to the excessive force allegations at issue in the present case. In other words, Plaintiffs' allegations do not satisfy the "similarity" requirement for pleading a "wide-spread practice" claim under *Monell*.
[71] *Id.* at ¶ 53.

does it expressly address Defendants' summary judgment arguments with respect to Plaintiffs' *Monell* claims. Instead, the Opposition focusses solely on the events of August 21, 2020, culminating in Pellerin's shooting.[72]  Accordingly, the Court is left with the bare allegations of the Complaint in determining whether there is a triable issue as to Plaintiffs' *Monell* claims against LCG.

A plaintiff may point to prior occurrences of constitutional violations to plead a *Monell* claim against a municipality. Those prior occurrences, however, must be not only similar to conduct at issue in the plaintiff's case but also persistent as opposed to sporadic or isolated.[73] This persistency requirement ensures that the alleged pattern of unconstitutional actions by municipal officers is based on conduct that has "occurred for so long and with such frequency that the course of conduct demonstrates the [municipality's] knowledge and acceptance of the disputed conduct."[74] The Fifth Circuit also requires a plaintiff to plead more than a list of  past actions alleged to be unconstitutional; a plaintiff must place these past occurrences in context to support the inference that the municipality knew about and accepted a wide-spread course of unconstitutional conduct.[75] For example, in *Peterson v. City of Fort Worth, Tex.*,[76] the plaintiff identified 27 excessive force complaints of against the Fort Worth Police Department over approximately four years. The court held that these prior occurrences did not support a *Monell* claim because the plaintiff "failed to provide context" to those 27 excessive force complaints sufficient to show that the complaints reflected municipal policy: "Twenty-seven incidents in

---

[72] *Ratliff*, 948 F.3d at 285 (to prove a *Monell* claim a  plaintiff  "must do more than describe the incident that gave rise to his injury.").
[73] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010).
[74] *Id.*
[75] *Peterson*, 588 F.3d at 851–52.
[76] *Id.*

four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy."[77]

Here, Plaintiffs' allegations do not show a wide-spread practice or pattern that rises to the level of municipal policy. Specifically, Plaintiffs' allegations with respect to the 107 lawsuits filed against LPD from 2010 through 2019 do not describe the nature or circumstances of the conduct at issue in 100 of those 107 cases. The seven excessive force cases actually described in the Complaint were filed over a thirteen-year period—more than three times longer than four-year period and 27 complaints that the *Peterson* court found insufficient to establish a municipal policy.[78] Moreover, like the plaintiff in *Peterson*, Plaintiffs do not place these seven excessive force complaints in context to show that they reflect a pattern that rises to the level of LCG policy.[79] For example, Plaintiffs do not point to evidence placing these complaints in the context of total arrests, nor do they point to evidence showing comparisons to similar municipalities.

Nor does Plaintiffs' allegation that 1,172 use-of-force reports were filed by LPD officers from 2010 through 2019 show such a pattern without additional context.[80] A use-of-force report does equate to evidence of an *excessive* use of force absent facts showing the nature of and context for the use of force. Plaintiffs plead no facts—nor point to any evidence in response to the Motion for Summary Judgment—showing that this number of use-of-force reports is so unusual or extreme that it supports an inference of a persistent pattern of *excessive* force

---

[77] *Id.* at 851 n.4.

[78] Moreover, even considering the "ten more lawsuits" referenced in the complaint—but not individually described—the total lawsuits referenced in the complaint amounts to just over one per year.

[79] *Peterson,* 588 F.3d at 851–52. The Complaint also alleges that "[a]t least ten more lawsuits have been filed in federal court alone detailing excessive use of force, improper training, improper hiring, and improper discipline against LPD." ECF No. 3 at ¶ 55. These allegations, however, omit the time frame of these ten lawsuits or any description of the nature and circumstances of the conduct challenged in those cases. Plaintiffs' opposition to the Motion for Summary Judgment does not address this omission.

[80] ECF No. 3 at ¶ 53.

violations. For example, Plaintiffs do not place this statistic into the context by showing the total number of arrests, nor do they offer comparisons to other, similarly situated municipalities.[81]

In contrast, in *Flanagan v. City of Dallas*,[82] the court held that the plaintiff sufficiently pled a *Monell* claim based on a pattern of excessive force applied by members of the Dallas Police Department. There, the plaintiff pled a combination of statistics, past incidents, and statements by city officials.[83] The plaintiff's allegations included statistics comparing the City of Dallas to similarly situated municipalities as far as police misconduct, the number of grand juries convened and internal affair investigations conducted regarding police misconduct, and the number of shootings of unarmed individuals by Dallas police officers during the same year that the plaintiff was subjected to unreasonable force.[84] Unlike *Flanagan*, Plaintiffs' allegations do not provide the context required to support a plausible *Monell* claim. Nor does their Opposition to the Motion for Summary Judgment overcome this pleading deficiency by pointing to evidence supporting their allegations of a pattern of excessive force by the LPD.

Plaintiffs also appear to allege a *Monell* claim based on allegations that Morgan, LPD, and LCG failed to supervise and train LPD officers. For example, Plaintiffs allege that "upon information and belief, Defendants Morgan, LPD, LCG, Defendant John Doe #5, LPD, did not properly train, supervise, and/or discipline Defendants John Doe #1-#4 and #6-10 with regard to proper police practices."[85] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[86] To state a claim of municipal liability for a

---

[81] *Peterson,* 588 F.3d at 851 n. 2.
[82] 48 F.Supp. 3d 941, 953 (N.D. Tex. 2014).
[83] *Id.*
[84] *Id.* at 953.
[85] ECF No. 3 at ¶ 48; *see also Id.* at ¶ 60 ("Defendants Morgan, Defendant John Doe #5, LPD, and LCG are guilty of the following wrongful acts, including but not limited to…[f]ailure to train, supervise, and discipline LPD officers regarding providing honest and accurate accounts of officer involved shootings to investigating authorities.").
[86] *Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350, 1359, 179 L.Ed. 2d 417 (2011).

failure to train or supervise municipal employees, a plaintiff must plead facts showing that: "(1) the municipality's training policy procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation."[87]

Defendants argue that Plaintiffs have failed to raise a genuine issue of material fact as to the first and second elements of a municipal failure-to-train claim. The Court agrees. A plaintiff alleging inadequate training must "allege with specificity how a particular training program is defective."[88] In the present case, Defendants have come forward with evidence of the training received by the LPD officers involved in Pellerin's shooting, including training on the use of force, as well as an expert report addressing the actions of the responding officers.[89] In contrast, Plaintiffs have not pled facts or come forward with evidence showing how LCG's training was defective or insufficient. Nor have they shown how any defects in training caused the constitutional deprivations alleged in the Complaint.

Defendants also argue that there is no triable issue with respect to deliberate indifference. The failure to train must reflect a "deliberate" or "conscious" choice by the municipality—in other words, rise to the level of municipal policy—for that municipality to be held liable for such a failure.[90] "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[91] "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

---

[87] *Kitchen v. Dallas Cty.,* 759 F.3d 468, 484 (5th Cir. 2014).
[88] *Id.* at 345.
[89] ECF No. 35-6, Exhibit E to Defendants' Motion for Summary Judgment, Report of Emanual Kapelsohn.
[90] *Id.* at 389.
[91] *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed. 2d 626 (1997).

inference."[92] There are two ways a plaintiff can establish a municipality's deliberate indifference to the need for proper training. First, the plaintiff may demonstrate that a municipality had "[n]otice of a pattern of similar violations," which were "fairly similar to what ultimately transpired" when the plaintiff's own constitutional rights were violated.[93] The second approach to proving a failure-to-train claim is the limited exception for "single-incident liability," which represents the rare case where a constitutional violation results from "the highly predictable consequence" of a particular failure to train.[94]

Here, Plaintiffs have not pled facts or pointed to evidence showing a pattern of similar violations that should have placed LCG or LPD on notice of the need for more or different training. The Pellerins' reliance on the 107 civil lawsuits filed against LCG and LPD does not demonstrate this pattern because—as explained in connection with Plaintiffs' claim based on a "wide-spread practice"— Plaintiffs' allegations do not show that these lawsuits arose from conduct similar to the conduct at issue in the present case. Moreover, the seven use-of-force complaints described by Plaintiffs do not support their failure-to-train claim because Plaintiffs have not shown that these seven complaints over a thirteen-year period reflect a persistent pattern of misconduct versus isolated incidents.

Nor do Plaintiffs' allegations state a plausible claim based on the "single-incident liability" exception. Plaintiffs do not plead facts or point to evidence describing how Morgan or the other defendants with a supervisory role failed to adequately train or supervise the other defendants. Instead, Plaintiffs allege the facts showing the events of August 21, 2020 and then merely add the conclusionary and formulaic assertion that this conduct resulted from LCG's

---

[92] *Smith*, 158 F.3d at 912.
[93] *Kitchen,* 759 F.3d at 484.
[94] *Id.*

failure to adequately train and supervise the defendant officers who allegedly applied excessive force in his arrest.[95] Plaintiffs also do not point to any evidence creating a triable issue as to "single-incident liability" in their Opposition to the Motion for Summary Judgment. Accordingly, the Court grants the Defendants' Motion for Summary Judgment with respect to Plaintiffs' *Monell* claims against LCG.

### D. State Law Claims.

Finally, Defendants move for summary judgment on Plaintiffs' state law claims. In Count IV of the Complaint (paragraphs 66-67), Plaintiffs assert claims for wrongful death, assault, battery, aggravated battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and malfeasance in office against "Defendants John Doe #1-4 and #6-10."[96] In Count V of the Complaint (paragraphs 68 and 69), Plaintiffs assert the same claims against Morgan, LCG, and "Defendant John Doe #5 in his or her official capacity" but add additional claims for negligent hiring, negligent retention, and negligent supervision.[97] They also assert a claim against LCG for vicarious liability under article 2320 of the Louisiana Civil Code. The Court addresses these claims in turn.

#### 1. Claims Asserted Against John Does 1-10.

Plaintiffs' state law claims against the "John Doe" officer defendants face the same timeliness issues as their federal claims against these unidentified defendants. Under Louisiana law, a petition that asserts state law claims against a "fictitious defendant" as opposed to an actual, identified defendant is "without legal effect."[98] As explained previously, Plaintiffs have not amended their Complaint to substitute the names of the actual defendants, and the deadline to

---

[95] ECF No. 10 at ¶ 24.
[96] ECF No. 3 at ¶¶ 68 – 69.
[97] *Id.* at ¶¶ 68 – 69.
[98] *Hill v. Shell Oil Co.*, 760 So. 2d 511, 512-13 (La. App. 5 Cir. 4/25/00).

amend pleadings and join parties under the scheduling order has lapsed.[99] Moreover, even if Plaintiffs had been granted leave to amend, their state law claims have prescribed under state law. Plaintiffs' state law claims claims are subject to the one-year prescriptive period for delictual actions under article 3492 of the Louisiana Civil Code.[100] This prescriptive period "commences to run from the date of injury or damage is sustained."[101] The party asserting a defense of prescription under Louisiana law generally has the burden of proving that the action is subject to prescription.[102] If an action is prescribed on its face, however, the burden shifts to the plaintiff to show that the prescriptive period was suspended or interrupted.[103]

Here, the claims against the "John Doe" officer defendants are prescribed on their face. These claims arise from the events of August 21, 2020, over three years ago. Ordinarily, an amendment to a Louisiana state court petition relates back to the date of filing for purposes of prescription. But "prescription is not interrupted as to an actual defendant when only a fictitious defendant is named in a petition, unless prescription is interrupted by some other means."[104] Applying this rule here, an amendment in the present case naming the actual officer defendants in place of "Defendants John Doe #1-10" would not relate back to the commencement of this case absent some other ground to suspend or interrupt prescription, and the record reflects no such ground.[105] The Court, therefore, grants the Motion for Summary with respect to the claims

---

[99] ECF No. 22. As noted above, the Court continued the trial date and the unexpired deadlines in the scheduling order in light of the Motion for Summary Judgment. ECF No. 49. However, the deadline for amendments and joinder of parties had already expired at that time.

[100] La. Civ. Code art. 3492. The comments to this provision state that "[t]he notion of delictual liability includes: intentional conduct, negligence, abusive right, and liability without negligence." *Id.* (Comment (b)).

[101] *Id.*

[102] *Petry v. Hebert*, 957 So. 2d 286, 288 (La. App. 3 Cir. 5/2/07).

[103] *Id.*; *Hill*, 760 So. 2d at 512-13.

[104] *Gallina v. Hero Lands Co*., 859 So.2d 758, 767, n. 6 (La. App. 4 Cir. 10/7/03)  (quoting *Hill*, 760 So.2d at 512–13).

[105] Under Louisiana law, a "suit brought against one debtor in solido interrupts prescription with regard to all." La. Civ. Code art. 2097. But prescription is not interrupted by filing suit against a fictitious defendant if the petition is not amended to add the true name of the defendant until *after* the prescriptive period has run. *Templet v. Johns*, 417 So. 2d 433, 437 (La. Ct. App.), *writ denied*, 420 So. 2d 981 (La. 1982)(citations omitted)("suit against 'John Doe

asserted against the John Doe officer defendants in Counts IV and V of the Complaint. Those claims are dismissed.

## 2. Assault and Battery.

Under Louisiana law, "[a]ssault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."[106] A claim for battery requires proof of "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact ...."[107] Claims for assault and battery against a law enforcement officer acting in the course of employment require proof that the law enforcement officer acted with unreasonable or excessive force.[108] "Whether the force used is reasonable

---

(electrical contractor)' did not interrupt prescription as concerns [the defendant whose true name was later substituted for the fictitious name] unless same was interrupted by other means."). Here, the prescriptive period has run without the Doe officers' fictitious names being substituted by their true names. Accordingly, while the Complaint in the present case names the ten "John Doe" officer defendants, Morgan, and LCG as defendants in solido, the timely claims against Morgan and LCG do not interrupt prescription as to the unnamed officer defendants.

     Similarly, in *Hill v. Shell Oil Co.*, the court discusses another basis for finding that amendments adding new parties relate back to the commencement of the action. 760 S.2d at 513. These criteria are (1) the "amended claim must arise out of the same transaction or occurrence set forth in the original pleading;" (2) the defendant substituted into the case had received notice of the action and will not be prejudiced in "maintaining a defense on the merits;" (3) the "substitute defendant must know or should have known that but for a mistake concerning the identity of the proper party defendant, the action would have been brought against him;" and (4) the "substitute defendant must not be a wholly new or unrelated defendant, since this would be tantamount to assertion of a new cause of action which would have otherwise prescribed." 760 So. 2d at 512-13. In the present case, the summary judgment record does not reflect that all of the actual defendants received notice of the action and the claims asserted against them. The record also does not reflect that the actual defendants would not be prejudiced if they are formally substituted into the case at this late stage of the proceeding. The parties have already engaged in dispositive motions practice and key pretrial deadlines, such as the discovery deadline, have lapsed. Finally, federal caselaw distinguishes between amendments that substitute proper parties as a result of mistake versus amendments substituting actual defendants for fictitious "placeholder" defendants named in the complaint. The statute of limitations is generally not interrupted in the later case. While *Hill v. Shell Oil Co.* does not expressly make this distinction with respect to Louisiana law, the court required some showing of a "mistake" concerning the identity of the proper party. *Id.* In the present case, the use of "John Doe" defendants does not appear to result from a mistake; rather the fictitious defendants were named pending additional discovery that should have disclosed the names of the actual defendants. Yet, despite the opportunity to conduct discovery, Plaintiffs never attempted to timely substitute the actual defendants for the fictitious "placeholders" named in the Complaint. In sum, Plaintiffs have not demonstrated that prescription was interrupted based on this exception.

[106] La. Rev. Stat. Ann. § 14:36; *see also Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1135 (5th Cir. 2014) (defining assault as "the imminent threat of a battery") (citation omitted).

[107] *Landry v. Bellanger*, 851 So. 2d 943, 949 (La. 5/20/03).

[108] *Gerard v. Parish of Jefferson*, 424 So.2d 440, 444 (La. App. 1982); *see also Taylor v. United States*, 1991 WL 280066 (E.D. La. Dec. 19, 1991) ("Under Louisiana law, in the absence of the use of excessive force, a law

depends upon the totality of the facts and circumstances in each case," and factors to consider are: "(1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and (7) the exigencies of the moment."[109]

In the present case, Plaintiffs do not point to any evidence in the summary judgment record showing any actions by Morgan or LCG in connection with the August 2020 events leading to Pellerin's shooting and death that amount to assault or battery. There is no evidence of "harmful or offensive contact" by these defendants, or that they intentionally placed Pellerin "in reasonable apprehension of receiving a battery." Nor is there evidence that these defendants were present at the time Pellerin ran was shot and that they "acted with unreasonable or excessive force." Accordingly, Pellerin's state law claims for assault and battery against Morgan and LCG must be dismissed.

### 3.   Intentional and Negligent Infliction of Emotional Distress.

In order to recover for intentional infliction of emotional distress, Plaintiffs must prove: (1) that the conduct of Morgan and LCG was extreme and outrageous; (2) that the emotional distress suffered was severe; and (3) that these defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.[110] The conduct complained of must be so outrageous in character and so

---

enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest.").
[109] *Kyle v. City of New Orleans*, 353 So.2d 969, 972 (La. 12/19/77).
[110] *White v. Monsanto Co.*, 585 So.2d 1205, 1209–10 (La. 1991); *Deus v. Allstate Insurance Co.*, 15 F.3d 506, 514 (5th Cir.1994).

extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community.[111] "Louisiana law does not generally recognize an independent cause of action for negligent infliction of emotional distress."[112] The cause of action "is available under limited circumstances only."[113] Specifically, Louisiana tort law recognizes a cause of action for negligent infliction of emotional distress only in extraordinary situations, where there is an "especial likelihood of genuine and serious mental distress, arising from ... special circumstances, which serves as a guarantee that the claim is not spurious."[114] To state a claim for negligent infliction of emotional distress, a plaintiff must allege the following elements: (1) that an independent, direct duty was owed to plaintiff by defendant; (2) that the duty afforded protection to plaintiff for the risk and harm caused; (3) that the duty was breached; and (4) that the mental anguish suffered by the plaintiff was genuine and serious.[115] Under Louisiana case law, emotional distress is considered "serious" if "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."[116]

As with their assault and battery claims, Plaintiffs have not pointed to evidence in the summary judgment record showing conduct by Morgan or LCG that amounts "extreme and outrageous" conduct, or that they "desire[d] to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct."[117] With respect to the negligent infliction of emotional distress claim, Plaintiffs have

---

[111] *Id.*
[112] *Lann v. Davis*, 793 So. 2d 463, 466 (La. App. 2 Cir. 2001) (citing *Moresi v. Department of Wildlife*, 567 So. 2d 1081 (La. 1990)); *Bacas v. Falgoust*, 760 So. 2d 1279, 1282 (La. App. 5 Cir. 2000).
[113] *Lann*, 793 So. 2d at 466.
[114] *Moresi*, 567 So. 2d at 1096.
[115] *Bacas*, 760 So. 2d at 1282.
[116] *Held v. Aubert*, 845 So. 2d 625, 633–34 (La. App. 1 Cir. 2003).
[117] *White*, 585 So.2d at 1209–10 (La. 1991); *Deus*, 15 F.3d at 514.

not pointed to evidence of conduct by Morgan and LCG that breached an "independent, direct duty" to Trayford Pellerin or Plaintiffs, and that their actions caused "mental anguish" that was "genuine and serious."[118] Accordingly, Plaintiffs have not shown a triable issue with respect to their intentional and negligent infliction of emotional distress claims. These claims are, therefore, dismissed.

### 4.  Negligent Hiring, Supervision, and Retention.

Morgan and LCG next challenge Plaintiffs' state law claims for negligent hiring, supervision, and retention in Count V of the Complaint. These claims implicate Louisiana's discretionary immunity statute.[119] La. Rev. Stat. § 9:2798.1(B)  provides that "[l]iability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." This provision does not apply "(1) [t]o acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) [t]o acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct."[120] In *Roberts*, the Fifth Circuit explained that "Louisiana courts have adopted a test analogous to the FTCA discretionary function test in determining whether an official is protected by the statute, namely, (1) whether a state law, regulation, or policy specifically prescribes the officer's course of action; and (2) whether the challenged action is grounded in political, economic, or social policy."[121] Applying this discretionary function test,

---

[118] *Bacas*, 760 So. 2d at 1282.
[119] *Roberts v. City of Shreveport*, 397 F.3d 287, 298 (5th Cir. 2005).
[120] La. Rev. Stat. 9:2798.1(C).
[121] *Roberts*, 397 F.3d 287 at 298.

state and federal courts have held that Louisiana's discretionary immunity statute immunizes

officers from state-law negligent training, hiring, supervision, and retention claims.[122]

In the present case, the Complaint alleges few facts supporting Plaintiffs' negligent

hiring, training, and retention claims. The Complaint alleges in detail the incidents in August

2020 that culminated in Pellerin's shooting.[123] The Complaint also alleges statistics on the use of

force by LPD officers and identifies several complaints of excessive force.[124] However, the

Complaint does not allege facts explaining how LPD's training program or any actions by

Morgan or LCG support Plaintiffs' claims that they were negligent and in hiring, training, and

retaining LPD officers. As previously noted, Morgan and LCG point to evidence in the summary

judgment record detailing training received by LPD officers. In contrast, Plaintiffs' Opposition to

the Motion for Summary Judgment does not point to any evidence relating to LPD's hiring,

training, or retention practices, nor does the Opposition address Morgan's and LCG's argument

that these negligence claims should be dismissed. Based on the Complaint, Plaintiffs' negligent

hiring, training, and retention claims fall squarely within Louisiana's discretionary immunity

statute because they reflect duties that are not prescribed by law or regulation but are instead

grounded in policy considerations.[125] Accordingly, the Court grants Morgan's and LCG's

Motion for Summary Judgment with respect to Plaintiffs' state law negligent hiring, training, and

retention claims.

---

[122] *See id.* (La. Rev. Stat. 9:2798.1(B) renders police chief immune from state-law claims premised on his "training officers under his command"); *Smith v. Lafayette Parish Sheriff's Dep't*, 874 So. 2d 863, 868 (La. App. 3 Cir. 2004) (sheriff's "hiring/retention policy was a discretionary act" for purposes of immunity under La. Rev. Stat. 9:2798.1); *Hoffpauir v. Columbia Cas. Co.*, No. 12-403, 2013 WL 5934699, at *12 (M.D. La. Nov. 5, 2013) ("[T]he hiring, training, and supervision policy of the Livingston Parish Sheriff's Department is a discretionary function."); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321 (M.D. La. 2021) (sheriff's "duties to train, supervise, and hire are not prescribed by law or regulation, and these duties are grounded in policy considerations").
[123] ECF No. 3 at ¶¶ 5-37.
[124] *Id*. at ¶¶ 53, 55.
[125] *Roberts*, 397 F.3d 287 at 298.

### 5. Malfeasance in office.

Defendants next challenge Plaintiffs' malfeasance claim. In *Ellett v. Newland,* the Louisiana Supreme Court defined the tort of malfeasance as the "doing of an act which is wholly wrongful and unlawful, ... the doing of an act which a person ought not to do at all."[126] Federal courts have subsequently interpreted *Ellett* as generally requiring defendants to have "knowingly committed a wrongful criminal act" to be liable for malfeasance.[127] Here, Plaintiffs have not alleged a factual basis for a malfeasance claim against Morgan or LCG, nor have they pointed to evidence in the summary judgment record that would support a triable issue on a malfeasance claim. Accordingly, the Court grants the Motion for Summary Judgment  with respect to this claim.

### 6. Vicarious Liability/*Respondeat Superior*.

Finally, Morgan and LCG challenge Plaintiffs' vicarious liability claims. Unlike Section 1983 actions, "[m]unicipalities do not enjoy special protection from vicarious liability under Louisiana law and are subject to *respondeat superior* like every other employer."[128] Vicarious liability requires an employment relationship but, even if such a relationship exists, "an employer will not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of employment with the former."[129] Plaintiffs' vicarious liability claims against Morgan and LCG are based on the conduct of the LPD officers involved

---

[126] 171 La. 1019, 1024 (La. 1931).
[127] *Boyte v. Wooten*, No. 04-1818, 2007 WL 3023935, at *7 (W.D. La. Oct. 16, 2007); *see also Scott v. Northern La. Med. Ctr.*, No. 16-0376, 2016 WL 8470184, at *11 n.19 (W.D. La. Sept. 9, 2016) (plaintiffs failed to "allege any facts to suggest that defendants were guilty of a criminal act" in support of their malfeasance claim); *Jones v. Herlin*, No. 12-1978, 2013 WL 5270547, at *7 (W.D. La. Sept. 17, 2013) ("[M]alfeasance under Louisiana law appears to be reserved for extremely egregious offenses, generally [rising] to the level of criminal conduct.").
[128] *Deville v. Marcantel*, 567 F.3d 156, 173–74 (5th Cir.2009) (citing *Brasseaux v. Town of Mamou*, 752 So.2d 815, 820 (La. 2000) ("Although an employment relationship may in fact exist, the employer will not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of employment with the former.")).
[129] *Brasseaux*, 752 So.2d at 820.

in Pellerin's shooting and their allegations the officers used excessive force. As explained above, Louisiana state law claims for assault and battery against a law enforcement officer acting in the course of employment require proof that the law enforcement officer acted with unreasonable or excessive force.[130] "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case," and factors to consider are: "(1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and (7) the exigencies of the moment."[131]

Morgan and LCG acknowledge that excessive force claims are fact intensive but nevertheless argue that Plaintiffs have no evidence to support a state law claim for unreasonable or excessive force against the responding officers. "When facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably, [a court] can hold that an officer acted reasonably as a matter of law."[132] Here, Defendants point to evidence in the summary judgment record that:

- Pellerin was acting erratically and was brandishing a knife when responding officers initially encountered him;

- Pellerin walked away from responding officers and ignored their orders;

- Pellerin threatened to use the knife against the responding officers;

- the responding officers attempted to subdue Pellerin at least twice using their Tasers and the Taser shots failed;

---

[130] *Gerard v. Parish of Jefferson*, 424 So.2d 440, 444 (La. App. 1982); *see also Taylor v. United States*, 1991 WL 280066 (E.D. La. Dec. 19, 1991) ("Under Louisiana law, in the absence of the use of excessive force, a law enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest.").
[131] *Kyle v. City of New Orleans*, 353 So.2d 969, 972 (La. 12/19/77).
[132] *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 412 (5th Cir. 2009).

- Pellerin continued to ignore the commands of the responding officers and attempted to enter the second convenience store;

- the officers believed that Pellerin still possessed the knife; and

- before using deadly force, the responding officers noted there were customers in the second convenience store and were concerned for their safety.

Plaintiffs concede that facts are undisputed for the most part.[133] However, they point to two triable issues with respect to their state law excessive force claims. First, they argue that Pellerin may have been "behaving strangely" but that he was not threatening anyone and had not committed a crime—in other words, there was no basis for the responding officers to pursue Pellerin and to escalate their use of force.[134] Second, Plaintiffs contend that there is a disputed issue of material fact as to whether the responding officers were aware that there were customers in the second convenience store before they deployed lethal force on Pellerin. Specifically, they argue that the responding officers' body camera footage does not "clearly indicate that there were patrons located inside" the second convenience store at the moment the responding officers fired their weapons.[135]

Plaintiffs' first argument is refuted by the summary judgment record, which reflects additional facts supporting the officers' pursuit of Pellerin and escalation of force. In this regard, the record reflects that Pellerin was brandishing a knife and behaving erratically when the responding officers first encountered him. For example, one of the responding officers, Officer Kevin McFarlain, stated in his interview:

> I hurriedly placed my unit in park in the roadway just before Chalmette Drive on the frontage road, trying to block the suspect. I quickly exited, grabbed my K9 partner Kane, and drew my duty weapon with my right hand. My weapon is equipped with a tactical light which I shined on the suspect's body allowing me to

---

[133] ECF No. 44 at 10 ("Frankly, Movants accurately depict most aspects of the events that took place on the August evening that resulted in the shooting of Pellerin.").
[134] *Id.* at 10.
[135] ECF No. 44 at 15.

> observe a silver knife in his left hand with the blade sticking out, with a downward angle. The knife appeared to be approximately four (4) to eight (8) inches long and appeared to be curved at the tip. The suspect was walking toward me. As I pointed my firearm at the suspect, he swung the knife toward me very aggressively and yelled, "Fuck the dog." He continued to loudly scream incoherently. He was approximately 20 to 30 feet from me. I could hear fellow officers yelling and pleading with the suspect to drop the knife which he refused to comply. I also yelled numerous times for him to drop the knife which he did not comply. ... At this point, I was in fear of my and my K9 partner's safety.[136]

Statements by the responding officers and body cam footage also show that Pellerin ignored the officers' commands and entered a busy thoroughfare while attempting to evade the officers, as well as the failed attempts to subdue Pellerin with Tasers.[137]  Accordingly, considering the record as a whole, Plaintiffs' first argument does not create a triable issue on whether the responding officers used unreasonable or excessive force.

Plaintiffs' second argument is similarly refuted by the record. Plaintiffs do not dispute that the "use of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others."[138] Defendants point to evidence in the summary judgment record that the responding officers observed customers in the convenience store and feared for the safety of those customers because Pellerin had previously brandished a knife and had threatened to use it against the responding officers:

- Officer McFarlain "observed the suspect walking very aggressively towards the [second convenience store]" and "continued to yell and plead with the suspect to stop walking and drop the knife." McFarlain further stated that Pellerin "failed to comply and cooperate and continued to yell at officers, and swing and hold the knife in an extremely aggressive manner."[139]

---

[136] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 13 K-9 Ofc. Kevin McFarlain Interview).

[137] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Louisiana State Police Investigation File, Supplement 6 Cpl. Jarrell Moss Interview).

[138] *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014)  (quoting *Mace v. city of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").

[139] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 13 K-9 Ofc. Kevin McFarlain Interview).

- McFarlain further stated that "I looked into the store and saw numerous civilians." McFarlain stated that he "realized the incident was escalating as the suspect was closing in very quickly to the south entrance to the store and was failing to submit to officers' commands. ... Officers continued to yell at the suspect, 'Drop it Drop it. Do not do it. Get on the ground." Pellerin "ignored their orders and continued aggressively walking toward the door to the store, still holding, swinging, and waving the large knife."[140]

- McFarlain stated that, as Pellerin reached the door to the second convenience store, he "observed a black female wearing colorful clothing" and that she "was attempting to exit the store as the suspect was placing his right hand on the door." McFarlain stated that Pellerin "was still holding the knife and yelling out profanity."[141]

- Senior Corporal Tyler Howerton stated in an interview that as "we approached the Circle K convenience store, I observed several people inside, one a woman standing just inside the south facing entrance door." He explained that he "moved to a position with a clear lane of fire toward the suspect, so that I would not be firing, if it became necessary to discharge my firearm, to in the proximity of officers or innocent civilians." He stated that he "feared the suspect was going to enter the occupied business with the knife in his hand" and that was fearful for the safety of the citizens inside the business."[142]

- The body camera footage of another responding officer, Malik Savoy, shows customers at the door of the convenience store shortly before the officers discharged their firearms.[143]

In contrast, Plaintiffs do not point to any evidence supporting their position that the convenience store customers were not visible, nor do they point to any evidence contradicting the officers' account of viewing customers in the store and that they feared for their safety. In sum, Plaintiffs have not pointed to evidence sufficient to create a triable issue on whether the responding officers' use of force was unreasonable or excessive to support excessive force claims against these officers under Louisiana law. Because Plaintiffs cannot support state law excessive force

---

[140] *Id.*

[141] *Id.*

[142] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 14 Sr. Cpl. Tyler Howerton Interview).

[143] ECF No. 35-3, Exhibit B to Defendants' Motion for Summary Judgment, Attachment 1 (Supplement 15 Ofc. Malik Savoy Interview; Malik Savoy Body Camera File at 1:18 – 1:22).

claims against the responding officers, they cannot support a vicarious liability claim against their employer, LCG. Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' vicarious liability claims against LCG. Those claims are dismissed.

As noted above, the fictitious insurers have not been served and their true names were not timely substituted.  Furthermore, the claims against them are derivative of the claims against the named defendants, as they were only named to ensure that Plaintiffs can recover damages in the event they prevail on their claims against the named defendants.  For the reasons the "John Doe" officers were dismissed, and because all of Plaintiffs' claims against the named defendants have been dismissed, Plaintiffs claims against "ABC Insurance Company" and "XYZ Insurance Company" are dismissed.

## IV.
### CONCLUSION

As set forth herein, the Court grants Defendants' Motion for Summary Judgment in its entirety. Plaintiffs' claims against Chief Morgan, LCG, the "Doe" officer defendants, and the "ABC" and "XYZ" insurance companies are DISMISSED WITH PREJUDICE.

THUS DONE in Chambers on this 20th day of December, 2023.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE